IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2020

## IN RE RAYLAN W.

Appeal from the Juvenile Court for White County
No. JV-1424, JV-4629      Sammie E. Benningfield, Jr., Judge
_____

### No. M2020-00102-COA-R3-PT
_____

After Mother failed to timely appeal the final order terminating her parental rights, she sought relief pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure. The trial court denied the motion, and Mother timely appealed from that order. Because we conclude that the trial court erred in denying Mother's Rule 60.02 motion, we proceed to consider the correctness of the trial court's final order terminating Mother's parental rights. But we conclude that the trial court did not err in finding clear and convincing evidence of grounds for termination and that termination is in the child's best interest. We therefore affirm the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part; Affirmed in Part**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, J., joined. RICHARD H. DINKINS, not participating.

Elizabeth Roderick, Chattanooga, Tennessee, for the appellant, Elaina L. W.

Herbert H. Slatery, III, Attorney General and Reporter; Jeffrey D. Ridner, Assistant Attorney General, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

### BACKGROUND

This case involves a petition to terminate the parental rights of Respondent/Appellant Elaina L.W. ("Mother") by Petitioner/Appellee the Tennessee Department of Children's Services ("DCS"). Mother's involvement with DCS began in 2013 when her son, born in 2010, was removed from her custody. Mother thereafter

successfully completed a drug rehabilitation program at the Nashville Rescue Mission. Due to Mother's progress, the child was returned to Mother on a trial basis. Eventually, on December 5, 2016, the child was returned to Mother's legal and physical custody.

Approximately six months after DCS terminated its involvement with Mother, on June 16, 2017, Mother was arrested for driving under the influence ("DUI") and reckless endangerment;[1] the child was in the vehicle and six years old at the time. DCS removed the child and returned him to his previous foster family ("Foster Parents"). Mother was later found guilty of these charges and sentenced to an eleven-month, twenty-nine-day jail sentence. All but forty-seven days of the sentence, however, was suspended.

DCS filed a dependency and neglect petition regarding the child in July 2017. The juvenile court declared the child dependent and neglected, as well as the victim of severe abuse by order of August 8, 2017. No appeal was taken from that order.

DCS created several permanency plans for Mother throughout the case; Mother often participated in their creation. Generally, the plans contained steps intending to ameliorate Mother's legal, drug, mental health, and stability issues. In particular, the first permanency plan directed Mother not to dye her hair so as to facilitate hair follicle drug testing.

Mother made progress on many of the tasks required of her for some time. Mother, however, was discharged from mental health counseling due to nonattendance in May 2018. Mother was employed off-and-on during this time and sometimes paid child support; her last support payment occurred in July 2018.

Mother's drug use was also still in question. Although Mother initially passed all scheduled drug tests, she was never able to provide a sample on a single unannounced drug screen. Mother also bleached her hair in violation of the permanency plan requirements, leading to a court order restricting her ability to do so.

Mother also attended the majority of her visitations with the child, though she sometimes missed due to forgetting or other issues. For example, the DCS caseworker testified that from June 2017 to August 2018, Mother missed only eight visits of the approximately forty-five offered; from August 2018 to March 2019, however, Mother missed seventeen visits out of twenty-four that were offered.[2] Mother refused visitation after her relapse in the Winter of 2018–2019, stating that she was not in a place that she "deserved" visitation. During the visits that did occur, the child referred to Mother as "Momma Elaina" and appeared close and loving with Mother. Sometimes following the

---

[1] Mother had previous legal issues, some of which pre-dated the birth of the child. These charges included shoplifting/theft, assault, and various violations of probation.

[2] Mother was incarcerated for three of the visits.

visits, however, the child would exhibit poor behavior; those behaviors have improved over time. The child refers to his current foster parents as "mom and dad." Mother also maintained phone calls and letters with the child.

The lingering questions as to Mother's sobriety were answered in October 2018, when a hair follicle drug screening indicated that Mother had used amphetamines and methamphetamines. When the DCS caseworker discussed the positive result with Mother, Mother admitted the drug use, but denied that she was using daily. Later, Mother told DCS that she was glad that DCS was aware of the drug use so that she could have a fresh start. Mother admitted that she continued using drugs until December 2018.

Mother's legal issues also continued. In December 2018, Mother was arrested in Cumberland County for possession of methamphetamine. This charge caused her probation on earlier charges in White County to be revoked. Mother's sentence for the Cumberland County charges was to run concurrent to the resulting sentence for violation of probation in White County.

As a result of Mother's relapse and criminal charges, on December 28, 2018, DCS filed a petition to terminate Mother's parental rights on five grounds.[3] Only two grounds, however, were pursued at trial or are at issue in this appeal: (1) severe abuse; and (2) persistence of conditions.

In January 2019, Mother began intensive outpatient therapy but was soon discharged for nonattendance.[4] Around January 15, 2019, Mother was evicted from her apartment. She was then essentially homeless for a period until she was remanded to the White County Jail for the probation violation. In March 2019, however, Mother was granted a furlough from jail to attend intensive inpatient substance abuse rehabilitation again at the Nashville Rescue Mission. Mother was still in this treatment program by the July 2019 trial on the termination petition.

There was no dispute at trial that Mother had passed all drug screens administered to her in rehabilitation and that she was progressing through the program. As long as Mother continued to progress, she could graduate from the program as early as August 2019. At that time, however, Mother would be required to return to White County to complete her jail sentence. Mother then hoped that she would be allowed to return to the Nashville Rescue Mission for post-rehabilitation support. Although the witnesses testified that they were unaware of anyone being allowed to return after a jail sentence in this manner, a Nashville Rescue Mission employee testified that it was "possibly . . . a

---

[3] The petition also sought to terminate the parental rights of the child's father. The father was present at the final hearing, and the trial court terminated his parental rights. The child's father is not a party to this appeal.

[4] According to the DCS caseworker, Mother attended only a single class.

possibility."

If Mother was allowed to return to the Nashville Rescue Mission, she would be required to first live in workers' dorms. There was some dispute as to whether the child could have overnight visits with Mother while she lived in these dorms, but there was no dispute that the child could not reside with Mother during this time. Once Mother obtained a job, she could then move to transitional housing, where it was believed that Mother would be able to have her son with her.[5] Mother conceded that her acceptance back to the Nashville Rescue Mission was not settled, but testified that she had applied to other housing in the Nashville-area in the event that she was not accepted at the Nashville Rescue Mission.

Mother was questioned extensively as to what made her efforts at rehabilitation different than in 2016 when she had previously completed the same program only to relapse months later. Mother noted first that she intended to stay in the Nashville-area, rather than return home to White County, as she had more support and less temptation. In addition, Mother and other witnesses described changes that had been made to the Nashville Rescue Mission program, which now included more focus on therapeutic treatment. Mother testified that this treatment had helped her cope with her childhood trauma that led to her addiction issues.

The child was placed with the same family following the second removal as he had previously resided upon the first removal. Although the family loved the child, it was not a pre-adoptive home. Recently, however, the foster mother's brother and his family had offered to adopt the child. The child had several visits with this family, some of which were observed by DCS. A DCS caseworker testified that a bond had already formed between the child and the prospective adoptive placement. The caseworker admitted, however, that the child could not currently visit with the prospective adoptive family due to bed bugs; the caseworker testified that the belief was that the prospective adoptive family moved into a new home that was "contaminated" with bed bugs and the child brought the bugs to his current foster family. According to the caseworker, the families "have paid extensive amounts of money" to exterminate the bugs.

The trial court orally ruled that Mother's parental rights would be terminated at the conclusion of the hearing. The trial court thereafter entered a detailed written order on October 7, 2019. Therein, the trial court ruled that DCS had shown clear and convincing evidence of both grounds for termination, as well as that termination was in the child's best interest.

---

[5] There was some discussion at trial that the child could not even reside here with Mother due to his age and sex. It was ultimately agreed, however, that the child likely could reside with Mother in transitional housing.

Mother did not, however, file a notice of appeal within thirty days of the entry of the final order. Instead, on November 14, 2019, Mother filed a motion for relief from the final judgment under Rule 60.02 of the Tennessee Rules of Civil Procedure. Therein, Mother asserted that her failure to file a timely notice of appeal was the result of the excusable neglect of her attorney and asked that a new final order be entered so that a timely appeal could be taken.

The motion was supported by the affidavit of Mother's counsel. The affidavit recounted that Mother informed her counsel that she wished to appeal on the date of the final hearing but that there was a delay in the entry of the written order. In the interim, however, Mother's counsel suffered significant personal issues:

7. In the three (3) weeks prior to the entry of the Termination Order, my husband was admitted to the Intensive Care Unit of Memorial Hospital in Chattanooga, Tennessee with a serious medical condition.

8. The day after my husband's release from the hospital, my 79 year old father was then air lifted to Erlanger Hospital. My father suffers from Parkinson's Disease as well as severe PTSD from his service in Vietnam. He is in a wheelchair and requires the use of a service dog.

9. After having emergency heart surgery and being subsequently released from the hospital, my father was required to move in with me and my family. I thus became my father's primary caregiver. In addition to moving my father's belongings into my home, this required modifications to my home to make it handicap accessible and coordination of various physical and occupational therapists. I was also required to take my father to many medical follow up appointments.

10. At this same time, my husband remained disabled due to his previous hospitalization. I was then caring for my children, my disabled husband, and my ailing father. As a result, I was working only part-time from home during most of September, October, and November, 2019. During this time, I was under tremendous stress which led to distractions from work.

11. Unfortunately, I failed to calendar the date (November 6, 2019) to file Mother's Notice of Appeal after the Termination Order was entered.

12. On November 12, 2019, I realized that I had not yet filed the Notice of Appeal and reviewed the necessary paperwork to file the same that day. Upon reviewing the Termination Order, I realized to my horror that it had been entered on October 7, 2019.

13. I recognized my failure immediately and took quick action to rectify the situation by researching and drafting a Motion For Relief From Judgment Entered October 7, 2019 ("Rule 60.02 Motion"). I filed the same less than 48 hours after realizing my mistake which was only five (5) business days past the deadline for filing the Notice of Appeal.

14. I have been practicing law for more than 16 years. I have never missed a

deadline to appeal an action, nor have I ever failed to timely file a required pleading. This was an extraordinary circumstance brought about by the enormous stress and distraction resulting from my husband's and my father's emergency medical conditions and all concomitant responsibilities resulting therefrom.

15. I did not fail to timely file the Notice of Appeal because of bad faith or to delay any proceedings. I believe that my failure to timely file the Notice of Appeal was due to excusable neglect and that my client's right to appeal the Termination Order should not be prejudiced because of this.

DCS and the child's guardian ad litem ("GAL") filed a joint response in opposition to Mother's motion. No affidavits were attached, and the response did not dispute any of the facts alleged in Mother's counsel's affidavit. Rather, the response argued that the facts as alleged were simply insufficient to support relief under Rule 60.02, as they amounted to no more than carelessness on the part of Mother's counsel. The response further alleged that DCS and the child would be prejudiced by the delay.

The trial court held a hearing on Mother's motion on December 2, 2019. The parties waived oral argument and agreed for the trial court to rule on the motion solely based on the papers filed with the court. Ultimately, the trial court denied Mother's motion by order of January 8, 2020. Mother filed a timely notice of appeal from this order.

## ISSUES PRESENTED

Mother raises three issues in this appeal. After our review, we conclude that this appeal involves two dispositive issues:

1. Did the trial court abuse its discretion in denying Mother's Rule 60.02 motion?
2. If so, did the trial court err in granting DCS's petition for termination of Mother's parental rights?

## DISCUSSION

## I. Rule 60.02

Mother first asserts that the trial court erred in denying her motion for relief under Rule 60.02 of the Tennessee Rules of Civil Procedure. Rule 60.02 provides, in relevant part, as follows:

On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic),

- 6 -

misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than one year after the judgment, order or proceeding was entered or taken. . . .

According to our Supreme Court,

> The general purpose of Rule 60.02 is "'to alleviate the effect of an oppressive or onerous final judgment.'" *Black v. Black*, 166 S.W.3d 699, 703 (Tenn. 2005) (quoting *Killion v. Dep't of Human Servs.*, 845 S.W.2d 212, 213 (Tenn. 1992)). Rule 60.02 is equally aimed at striking a "proper balance between the competing principles of finality and justice." *Jerkins v. McKinney*, 533 S.W.2d 275, 280 (Tenn. 1976). Thus, relief under Rule 60.02 is not meant to be used in every case in which the circumstances of a party change after the entry of a judgment or order, nor by a party who is merely dissatisfied with a particular outcome. *Toney v. Mueller Co.*, 810 S.W.2d 145, 146 (Tenn. 1991). Instead, relief is appropriate only in those relatively few instances that meet the criteria of the rule. *Id.*
> Rule 60.02 has been described as an "escape valve from possible inequity that might otherwise arise from the unrelenting imposition of the principle of finality imbedded in our procedural rules." *Thompson v. Firemen's Fund Ins. Co.*, 798 S.W.2d 235, 238 (Tenn.1990). Out of respect for the finality afforded to legal proceedings, this "'escape valve' should not be easily opened." *Toney*, 810 S.W.2d at 146. Accordingly, a party seeking relief from a judgment under Rule 60.02 bears the burden of proving that it is entitled to relief by clear and convincing evidence. *McCracken*, 958 S.W.2d at 795.

*Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 336 (Tenn. 2010).

"A Rule 60.02 motion for relief from a judgment is within the sound discretion of the trial court and the court's ruling on a Rule 60.02 motion may not be reversed on appeal unless it is determined that the court abused its discretion." *Holiday v. Shoney's South, Inc.*, 42 S.W.3d 90, 92 (Tenn. Ct. App. 2000) (citations omitted). Under this standard, we are not permitted to "substitute [our] judgment for that of the trial court[,]" and the trial court's ruling will be upheld "unless it affirmatively appears that the decision was against logic or reasoning, and caused an injustice or injury to the party complaining." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *Battleson v. Battleson*, 223 S.W.3d 278, 283 (Tenn. Ct. App. 2006).

Here, Mother seeks Rule 60.02 relief on the basis of excusable neglect in not timely filing her notice of appeal. Generally, notices of appeal to this Court must be filed within thirty days of the entry of judgment. Tenn. R. Civ. P. 4(a). The timing of the notice is mandatory and cannot be extended by this Court. Tenn. R. App. P. 3(e). Where no notice of appeal is timely filed, we lack jurisdiction to consider civil appeals. *John Barb, Inc. v. Underwriters at Lloyds of London*, 653 S.W.2d 422, 424 (Tenn. Ct. App. 1983). As this Court has explained, however,

> Even though our appellate courts have not been given the authority to extend the time period within which an appeal must be filed, the drafters of the Tennessee Rules of Appellate Procedure never intended that no relief would be available to parties who failed to file a timely notice of appeal. The Advisory Commission's Comments to Tenn. R. App. P. 4(a) provide in this regard that
>
> > Nothing in this rule or any other rule permits the time for filing notice of appeal to be extended beyond the specified 30 days, although in appropriate circumstances an otherwise untimely appeal may be taken by first securing relief under Tennessee Rule of Civil Procedure 60.02.
>
> Thus, it is now settled that trial courts can, in certain extraordinary circumstances, grant relief in accordance with the requirements of Tenn. R. Civ. P. 60.02 to parties who failed to file their notice of appeal within the period of time provided for in Tenn. R. App. P. 4(a). *Moody v. Moody*, 681 S.W.2d 545, 546 (Tenn. 1984); *Jerkins v. McKinney*, 533 S.W.2d 275, 281 (Tenn. 1976); *John Barb, Inc. v. Underwriters at Lloyds of London*, 653 S.W.2d 422, 423 (Tenn. Ct. App. 1983). However, this relief is generally granted in only the most extraordinary circumstances. *Travis v. City of Murfreesboro*, 686 S.W.2d 68, 69 (Tenn. 1985). When such relief is granted, it usually takes the form of vacating the original final judgment and then re-entering it thus causing the thirty day period within which to file a notice of appeal to begin to run again. *See* Note, *Failure to Timely File Notice of Appeal for First Tier Appellate Review: A Client's Rights*, 14 Mem. St. U.L. Rev. 483, 498 (1984).

*Jefferson v. Pneumo Servs. Corp.*, 699 S.W.2d 181, 184–85 (Tenn. Ct. App. 1985).

Cases in which parties have sought to avoid an untimely notice of appeal are generally brought under subsection (1) of Rule 60.02, allowing relief when the omission was the result of "excusable neglect." We have previously held that this standard is "very strict" in this context. *Id.* at 185 (citing federal precedent, which the court noted was persuasive because the rules allowing relief under federal law are "substantially similar to

Rule 60.02"). Consequently, "mere ignorance or carelessness of an attorney or his client, without more, will not provide the basis for [] relief." ***Id.*** (citing federal cases). In determining whether the circumstances permit relief, we have previously cautioned against a standard that "would permanently dilute the significance of the time limit in [Rule] 4(a)." ***Id.*** at 186.

Still, a trial court's determination of whether excusable neglect was shown is not unbounded. Rather, this Court has held that in order to determine whether neglect was excusable, the court should consider "all relevant circumstances surrounding the party's omission[,]" including

> (1) the danger of prejudice to the party opposing the late filing, (2) the length of the delay and its potential impact on proceedings, (3) the reason why the filing was late and whether that reason or reasons were within the filer's reasonable control, and (4) the filer's good or bad faith. These circumstances must be weighed both with and against each other because, if considered separately, they may not all point in the same direction in a particular case.

***Ferguson v. Brown***, 291 S.W.3d 381, 388 (Tenn. Ct. App. 2008) (citing ***State ex rel. Sizemore v. United Physicians Ins. Risk Retention Grp.***, 56 S.W.3d 557, 567 (Tenn. Ct. App. 2001)). A trial court abuses its discretion "when it fails to properly consider the factors on that issue given by the higher courts to guide the discretionary determination." ***State v. Lewis***, 235 S.W.3d 136, 141 (Tenn. 2007) (citing Martha S. Davis, *Standards of Review: Judicial Review of Discretionary Decisionmaking*, 2 J. App. Prac. & Process 47, 58 (2000)). Moreover, when the trial court's ruling provides little insight into the standard applied by the court in reaching its decision, "we are unable to afford appropriate deference to the trial court's decision." ***In re Connor S.L.***, No. W2012-00587-COA-R3-JV, 2012 WL 5462839, at *4 (Tenn. Ct. App. Nov. 8, 2012). Although we concede that there is no requirement that trial courts make findings of fact and conclusions of law when adjudicating Rule 60.02 motions, we have previously opined that we cannot adequately review the ruling for an abuse of discretion in the absence of some indication as to how the trial court reached its decision. ***Parimore v. Parimore***, No. W2016-01188-COA-R3-CV, 2017 WL 657771, at *4 (Tenn. Ct. App. Feb. 17, 2017) (quoting ***Spigner v. Spigner***, No. E2013-02696-COA-R3-CV, 2014 WL 6882280, at *6 (Tenn. Ct. App. Dec. 8, 2014) ("We concede that the express language of Rule 60.02 places no affirmative duty on the trial court to make findings of fact or conclusions of law in disposing of a Rule 60.02 motion. However, this Court has previously indicated that, with respect to a Rule 60.02 motion, we are 'unable to adequately review' a trial court's discretionary decision and provide the appropriate amount of deference to that decision when the trial court fails to make appropriate findings of fact and conclusions of law.")).

The substance of the trial court's ruling is as follows:

Specifically, the Court held that other attorneys find themselves in similar circumstances as those of Counsel for [Mother]; however, it is the opinion of this Court that those circumstances as stated in the Motion and Affidavit do not constitute excusable neglect. Therefore, the Motion is DENIED.

Clearly, the trial court's order fails to indicate if the trial court properly considered the multi-part test for determining whether neglect was excusable as set forth by this Court. And failure to consider the factors set forth by a higher court for guiding a decision may result in an abuse of discretion. *Lewis*, 235 S.W.3d at 141. Under these circumstances, we often vacate the trial court's ruling and remand for a more detailed explanation. *See, e.g., Spigner*, 2014 WL 6882280, at *6 (involving a parenting plan order, rather than a Rule 60.02 motion).

In the context of termination of parental rights, however, we are directed to expedite cases in order to further the best interests of parties. *See **In re Audrey S.***, 182 S.W.3d 838, 859 (Tenn. Ct. App. 2005) (citing Tenn. Code Ann. § 36-1-124) ("[W]e are statutorily required to expedite appeals in termination of parental rights cases to the extent consistent with the preservation of the rights of the parties."). As such, we conclude that the best course of action in this case is to independently review the facts and the applicable factors to determine whether Rule 60.02 relief is warranted. *Cf. **In re Josiah T.***, No. E2019-00043-COA-R3-PT, 2019 WL 4862197, at *4 (Tenn. Ct. App. Oct. 2, 2019) (suspending the Rules of Appellate Procedure to allow an appeal to proceed given the policy of expediting termination cases); *see also **Hampton v. Macon Cty. Bd. of Educ.***, No. M2013-00864-COA-R3CV, 2014 WL 107971, at *6 (Tenn. Ct. App. Jan. 10, 2014) ("[W]hen the trial court fails to make findings of fact or conclusions of law to support its decisions, we must independently review the record to determine whether the appropriate elements have been met."); ***Williams v. Singler***, No. W2012-01253-COA-R3-JV, 2013 WL 3927934, at *10 (Tenn. Ct. App. July 31, 2013) (declining to apply the abuse of discretion standard in a parenting plan case when the trial court failed to make sufficient findings of fact to support its decision). We will therefore independently review the facts as they relate to the applicable factors.

We begin with the prejudice to the opposing party. DCS contends in this case that the child would be prejudiced by the delay in resolving this case. As previously discussed, termination of parental rights cases are to be resolved in an expedited manner "to enable the child to achieve permanency, consistent with the child's best interests, at the earliest possible date." Tenn. Code Ann. § 36-1-101(a)(5). The law also disfavors a situation wherein a child lingers in foster care. *See* Tenn. Code Ann. § 36-1-113(g)(3) (creating a ground for termination in this situation, discussed in detail, *infra*). DCS asserts that the delay in this case therefore has prejudiced the speedy resolution of this case.

It is well-settled, however, that "[m]ere delay . . . does not constitute prejudice." ***Ferguson v. Brown***, 291 S.W.3d 381, 388 (Tenn. Ct. App. 2008) (citing ***State ex rel.***

***Sizemore v. United Physicians Ins. Risk Retention Grp.***, 56 S.W.3d 557, 568 (Tenn. Ct. App. 2001)). Rather, prejudice involves substantive harm, such as the "loss of opportunity to present some material aspect of its case" or "detrimental changes of position by one side." ***Sizemore***, 56 S.W.3d at 568. Neither DCS nor the GAL filed affidavits in support of their opposition to Mother's motion demonstrating any prejudice of this type. Generally, we do not presume prejudice in this context in the absence of evidence to that effect. *See* ***Ferguson***, 291 S.W.3d at 389 (holding that prejudice was not shown when the party opposing Rule 60.02 relief filed no affidavits detailing the prejudice that would be caused by granting the motion); *see also* ***Douglas v. Estate of Robertson***, 876 S.W.2d 95, 97 (Tenn. 1994) ("Prejudice will not ordinarily be presumed merely from the passage of time."). As such, we are chary of ruling that prejudice has been properly demonstrated in this case.

Even considering the delay engendered by Mother's motion, however, it strains credulity to state that it was significantly prejudicial. Mother's motion was filed within two weeks of the missed appeal deadline and adjudicated within about two months. Indeed, the trial court appears to have taken over a month to enter its order denying the motion following the hearing. We concede that Tennessee imposes deadlines on the trial court in order to expedite termination actions. *See* Tenn. Code Ann. § 36-1-113(k) ("The court shall ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child. The court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing."). We have held, however, that termination actions can proceed even when these deadlines are not met. *See, e.g.,* ***In re Maison W.***, No. M2015-02153-COA-R3-PT, 2016 WL 3192801, at \*16 (Tenn. Ct. App. May 27, 2016) ("We do not find the Trial Court's failure to enter its final order within thirty days of the conclusion of the hearing to fatally affect the validity of the order[.]"); ***In re M.R.W.***, No. M2005-02329-COA-R3-PT, 2006 WL 1184010, at \*4 (Tenn. Ct. App. May 3, 2006) (holding that the trial court was not divested of subject matter jurisdiction to enter a later termination order). That is fortunate for DCS, who ultimately prevails in its effort to terminate Mother's parental rights, as there was nearly a three-month delay between the termination hearing and the entry of the written order in this case.[6] Thus, this Court has held that the policy of expediting appeals has some flexibility to ensure that justice is done.

If the Rule 60.02 motion was granted, Mother would have been able to exercise her appellate rights for review in this Court, necessarily involving some delay in finality. However, even though the trial court denied the motion, Mother still had a right to appeal that ruling to this Court. No final resolution for the child can result until this appeal right is exhausted. Thus, the filing of the Rule 60.02 motion appears to have little impact on the

---

[6] According to Mother's counsel's affidavit in support of the Rule 60.02 motion, the delay occurred because DCS was awaiting transcripts from the trial with which to prepare the final order.

- 11 -

length of the proceedings. Finally, Tennessee law is clear that parents have a right to appeal termination proceedings and that this Court should fully consider their appeals even when their attorneys do not properly raise necessary issues. *See generally **In re Carrington H.**,* 483 S.W.3d 507, 525–26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."). As such, we must conclude that this factor does not favor denial of Mother's motion.

For the same reasons, we also conclude that the length of the delay in this case favors relief under Rule 60.02. As previously discussed, the delay caused by Mother's motion was approximately two months between when her appeal should have proceeded and when it did proceed.[7] Although the child certainly deserves permanence, the approximate two-month delay that occurred due to the hearing on the Rule 60.02 motion is relatively small when considering the length of this proceeding as a whole.[8] The fact that the case was further delayed by this appeal is also not particularly relevant. *See **Ferguson**,* 291 S.W.3d at 389 ("Admittedly, there has been a substantial delay due to this appeal; however, the delay caused by an appeal is not relevant to this analysis."). Moreover, because both parties have diligently briefed the substantive issues in this case, should Mother's request for relief be granted, any delay can be mitigated by resolving the substantive issues in this case in this appeal. *Cf. **Muesing v. Ferdowsi**,* No. 01-A-0190050-CV-00156, 1991 WL 20403, at *5 (Tenn. Ct. App. Feb. 21, 1991) (proceeding with an appeal as if a new order and notice of appeal had been entered following a Rule 60.02 motion). The permanence of the child is therefore not materially affected by the delay caused by the failure to file a timely notice of appeal and the Rule 60.02 procedure.

Next, we consider the "the reason why the filing was late and whether that reason or reasons were within the filer's reasonable control[,]" as well as whether bad faith was present. *Ferguson*, 291 S.W.3d at 388. Unlike the other factors, the trial court did address at least the first of these two factors, ruling that Mother's counsel's reasons were not sufficient. Mother points, however, to other cases in which similar circumstances were sufficient to afford Rule 60.02 relief. DCS argues, however, that these cases are distinguishable.

First, Mother cites *Figal v. Vanderbilt Univ.*, No. M2012-02516-COA-R3-CV, 2013 WL 5459021 (Tenn. Ct. App. Sept. 27, 2013). In this case, the attorney filed an affidavit in support of Rule 60.02 relief after missing the notice of appeal deadline detailing his own health problems, including the fact that he was on medications that caused

---

[7] Mother filed her notice of appeal following the denial of her Rule 60.02 motion very promptly—only five days later.

[8] In fact, the two-month delay is similar to the delay between when the final order should have been entered and when it was entered.

dizziness and drowsiness. *Id.* at *6. The trial court ruled that this condition, coupled with the fact that the attorney was a sole practitioner, was sufficient to support relief. *Id.* We affirmed the decision of the trial court, holding that this medical condition, coupled with the defendant's "failure to establish any prejudice, any potential impact of the delay, or any bad faith[,]" was sufficient to support the trial court's decision under the abuse of discretion standard. DCS argues, however, that *Figal* is distinguishable because Mother's counsel has not claimed that she herself was ill or under the influence of any medications.

Mother therefore cites another case in which it was not counsel that was suffering from health issues, but a member of counsel's family. In *Ferguson v. Brown*, the plaintiff's attorney missed a hearing on a motion for summary judgment. 291 S.W.3d at 384. After the motion was granted, the attorney filed a motion for relief from the judgment under Rule 60.02 and Rule 59.04 of the Tennessee Rules of Civil Procedure. *Id.* In support of the motion, the attorney filed an affidavit detailing that immediately prior to receiving the notice of hearing, attorney returned from a two-week vacation to learn that his brother and law partner had been diagnosed with cancer. *Id.* at 385. The attorney thereafter accompanied his brother out-of-town for tests and treatment in the weeks leading up to the summary judgment hearing. As a result, he failed to properly calendar the hearing on the motion for summary judgment and failed to appear at the hearing. *Id.* Based on these facts, the trial court denied the motion. *Id.* at 386.

This Court reversed the decision of the trial court, holding that the trial court should have granted the plaintiff's Rule 59.04 motion. Although there was no proof of prejudice and a delay of only a few weeks, we ruled that the circumstances were in plaintiff's counsel's control. *Id.* at 389–90. Although this factor weighed against a finding of excusable neglect, we further ruled that plaintiff's counsel acted in good faith. In support, we noted counsel's affidavit that he was dealing with his family member's serious life-threatening injury. *Id.* at 390. Thus, the failure to appear and respond to the motion for summary judgment was nothing more than an "inadvertent omission" and this factor favored a finding of excusable neglect. *Id.* Under these circumstances, we concluded that the trial court abused its discretion in denying the Rule 59.04 motion. *Id.* According to Mother, similar circumstances support Rule 59.04 relief in this case.

Again, however, DCS argues that *Ferguson* is not analogous because of the procedural posture of the case. Importantly, *Ferguson* involved a Rule 59.04 motion to set aside a default judgment, not a motion for relief from a final judgment. As such, DCS argues that it was required to be construed more liberally than the Rule 60.02 motion at issue in this case. *See Henry v. Goins*, 104 S.W.3d 475, 481 (Tenn. 2003) ("Courts construe requests for relief pursuant to Rule 60.02 much more liberally in cases involving default judgments than in cases following a trial on the merits."). Rather, DCS contends that this case involves a trial on the merits and Mother's counsel was fully aware of both Mother's wish to appeal and the timing of such an appeal.

Respectfully, we cannot agree that *Ferguson* provides no support in this case. Although *Ferguson* involved a Rule 59.04 motion for relief from a judgment that had yet to become truly final, the Tennessee Supreme Court has held that the same factors must be considered in adjudicating both Rule 59.04 and 60.02 motions. *See Discover Bank v. Morgan*, 363 S.W.3d 479, 494 (Tenn. 2012) (holding that relief should be granted more liberally when only a partial default judgment is attacked); *see also Howard v. Howard*, 991 S.W.2d 251, 256 n.2 (Tenn. Ct. App. 1999) ("Regardless of whether the Husband's motion was filed pursuant to rule 59.04 or rule 60.02, however, our analysis of the trial court's denial of the motion remains the same."); *Madu v. Madu*, No. M1999-02302-COA-R3-CV, 2000 WL 1586461, at *5 (Tenn. Ct. App. Oct. 25, 2000) (noting that a Rule 59.04 motion is reviewed "using standards similar to those used to review [Rule] 60.02(1) motions on similar grounds"). Moreover, while this case involves a trial on the merits, Mother does not seek to be awarded a new trial; she simply wants her chance to appeal the trial court's ruling. We therefore decline DCS's invitation to ignore the analysis in *Ferguson* where relevant.

The facts in *Ferguson* are highly analogous to the present case. Like in *Ferguson*, the failure to timely file a notice of appeal was in Mother's counsel's control, and there can be no dispute that the failure was not the result of bad faith. Like in *Ferguson*, Mother's counsel's affidavit details a situation where a significant family illness, in this case more than one, led to a mistake in calendaring a deadline. Neither DCS nor the GAL disputes these facts, and the trial court did not indicate that the allegations lacked credibility. Therefore, we take as true for purposes of appeal that Mother's counsel was enduring significant personal challenges at the time that the notice of appeal was due. Moreover, as previously discussed, no prejudice has been shown, and the delay that resulted from Mother's counsel's excusable neglect was not lengthy. Considering all of the relevant factors, we must therefore conclude that the trial court abused its discretion in denying Mother's motion. In light of Tennessee's policy of expediting appeals of this type and the fact that the parties fully briefed the substantive merits of this appeal, we will therefore proceed to "consider this case as if the trial court had" entered a new order. *Muesing*, 1991 WL 20403, at *5 & n.5 ("This case has already been briefed and argued. No useful purpose will be served by vacating the order and remanding the case solely for the entry of a[n] order granting post-judgment relief.").

## II.     Termination of Mother's Parental Rights

We therefore proceed to consider whether the trial court erred in granting DCS's petition to terminate Mother's parental rights. The Tennessee Supreme Court has previously explained that:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*,

- 14 -

530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); ***Stanley v. Illinois***, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010); ***In re Adoption of Female Child***, 896 S.W.2d 546, 547–48 (Tenn. 1995); ***Hawk v. Hawk***, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. ***In re Angela E.***, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also* ***Santosky v. Kramer***, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); ***In re Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113I; ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. ***Santosky***, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interests by clear and convincing evidence. Tenn. Code Ann. § 36-3-113I; ***In re Valentine***, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***In re Carrington H.***, 483 S.W.3d at 523–24 (citing ***In re Bernard T.***, 319 S.W.3d 586, 596 (Tenn. 2010); ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009); ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 809 (Tenn. 2007)). Our Supreme Court further explains:

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.,* 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.,* 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## A. Grounds

In this case, the trial court found two grounds supported termination of Mother's parental rights: severe abuse and persistence of conditions. Mother appeals only the persistence of conditions ground. We, however, will consider all of the grounds found by the trial court. *See In re Carrington H.*, 483 S.W.3d at 525–26 (directing us to consider all grounds found by the trial court whether appealed by the parent or not).

### 1. Severe Abuse

In Tennessee, a court may terminate parental rights when:

The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse" is defined, in relevant part, as: "The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(23)(A)(i).

In this case, the juvenile court found that the child was dependent and neglected and

the victim of severe abuse perpetrated by Mother by order of August 8, 2017. That order was never appealed and therefore became final. As we have previously explained in this context:

> The doctrine of res judicata applies when "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." ***Galbreath v. Harris***, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990). This court previously applied the doctrine of res judicata to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action. *See* ***State v. Tate***, No. 01-A-01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. Ct. App. Mar. 31, 1995).

***In re Heaven L.F.***, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010). Mother and DCS were parties to the dependency and neglect case and the issue of whether Mother committed severe abuse was litigated in that case. Therefore, the issue of whether Mother committed severe abuse is res judicata, and the trial court properly found a ground for termination under section 36-1-113(g)(4).

## 2. Persistence of Conditions

A second ground for termination may be found under the following circumstances:

The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(A)(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

- 17 -

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. 36-1-113(g)(3).

Here, the child was removed from Mother's custody and eventually declared dependent and neglected on August 8, 2017, more than six months prior to the termination trial. Mother argues, however, that the trial court erred in finding sufficient evidence that the conditions that led to the child's removal still persist.

The trial court's order follows the language of the above statute and makes the following specific findings as to Mother:

The conditions that led to the removal of the child from [Mother] include operating an automobile while under the influence of an intoxicant with the child in the vehicle; that the conditions that prevent the child's safe return to [Mother] include that she is homeless, has no income, and is serving a sentence that is being allowed to be served in treatment; and that [Mother] was advised of the criteria and procedures for termination of parental rights and understood that having the child removed from her custody for more than (6) months and failing to remedy the conditions that necessitate foster care was a ground for termination of parental rights.

* * *

38. The Court finds persistence of conditions exist because [Mother] is essentially in the same position today that she has been in from the very beginning. [Mother] is homeless, has no income, and is actually serving a sentence that is being allowed to be served in treatment. [Mother] has made some progress, but there are no results. The Court does not have a result where the child could now return home.

39. Based upon the proof presented, there is little likelihood that the conditions will be remedied at an early date so the children could be safely returned to [Mother] in the near future. Despite the Department having worked with [Mother] almost continuously for approximately five (5) years, [Mother] is still at essentially ground zero. As the Court has stated, there are no results.

40. The proof before the Court is that conditions persist which, in all probability, would cause the child to be subject to further abuse and/or neglect if returned to [Mother]. The Court specifically finds that [Mother] has not made an adjustment of circumstances.

41. Based upon the evidence presented, continuation of the parent and child relationship greatly diminishes the child's chances of an early integration

- 18 -

into stable and permanent home. The Court finds that out of the previous five (5) years [Mother] has had custody of the child for approximately six (6) months. [Mother] has still not demonstrated that she in is the position to provide permanency. As the Court previously stated. [Mother] is essentially in the same position today that she has been in from the very beginning. [Mother] is homeless, has no income. and is actually serving a sentence that is being allowed to be served in treatment. Thus, [Mother] is still at essentially ground zero.

According to Mother, however, the only basis cited for the removal of the child in juvenile court was her DUI and reckless endangerment arrest. Indeed, Mother notes that the juvenile court "made no findings as to Mother's lack of job, homelessness, or any other condition" in the order removing the child. Because Mother contends she has remedied her addiction issue and was soon to resolve all her criminal charges following the termination trial, she contends that no conditions persist that prevent reunification with the child.

Respectfully, Mother's argument ignores the plain language of section 36-1-113(g)(3). As we recently explained,

> This ground for termination . . . is not limited only to those conditions that led to the child's removal, but allows the court to also consider "other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A). Thus, neither the trial court nor this Court is confined in our review only to those conditions that were expressly found to support the dependency and neglect findings.

*In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *6 (Tenn. Ct. App. Nov. 25, 2019).

Our review supports the trial court's finding that there are conditions that remain present that would likely cause the child to be subjected to further neglect and that these conditions are likely to remain for the near future. The testimony presented at trial shows that while Mother has made considerable progress, her situation is still fraught with instability. At the time of trial, Mother owed her sobriety, her shelter, and her support to the Nashville Rescue Mission. Mother's plan to achieve reunification largely relied on this same support. Whether Mother would be offered this support and whether she would be able to care for her son were, unfortunately, precariously balanced on a slew of contingencies. First, Mother was required to graduate from her current program; the evidence presented suggested that this was likely to occur in the near future. After her graduation, however, Mother would be required to return to White County to serve the remainder of her jail sentence. Mother admitted that returning to White County was an obstacle to her sobriety. Then Mother hoped to be allowed to return to the Nashville Rescue

Mission. No testimony was presented to show that this had been approved or was even likely; indeed, the testimony was that this could "possibly be a possibility." Even if allowed to return, Mother would not be allowed to reunify with her child until she obtained a job. Even after obtaining a job and moving to housing, there was a likelihood, but not necessarily a certainty, that son would be able to reside with Mother. Given all of these contingencies, it is not likely that Mother will be able to care for the child in the near future.

Moreover, throughout all of this upheaval that is necessary for Mother to undergo to have a chance at reunification, Mother would need to maintain her sobriety. While we commend Mother on her current sobriety at the time of trial, there can be no dispute that Mother was currently residing in a very controlled environment, which almost certainly contributes to her sobriety. Indeed, Mother previously attended this very same rehabilitation center and was reunited with her son, only to relapse and lose custody of her child once again. Mother counters, however, that the Nashville Rescue Mission's program has changed and now focuses on the underlying causes of addiction through mental health treatment. Still, Mother admits that one reason that she relapsed was a return to White County; Mother admits that she will be required to return to the White County jail to complete her sentence. Additionally, Mother only chose to commit to rehabilitation once she was jailed; immediately preceding her furlough to the Nashville Rescue Mission, she attempted another rehabilitation program but could not be bothered to attend more than a single class.

Even with Mother's progress, it appears that Mother's life is still lacking in stability. Mother's plans related to reunification with the child are predicated on a number of contingencies, some of which she has very little control over. Moreover, Mother's sobriety has not been tested outside the controlled environment of the rehabilitation center. Unfortunately, Mother's current sobriety under these conditions does little to persuade us that she will continue her efforts in the future, in light of her previous treatment and relapse. Mother's drug addiction in the past placed the child in a dangerous situation. Consequently, these conditions, in reasonable probability, would cause the child to suffer from further abuse and neglect and therefore prevent the child's safe return to Mother's custody. Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Moreover, the uncertainty of Mother's future means that these conditions are unlikely to be remedied at an early date. Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii).

The child, however, deserves stability and permanence. Mother's decisions and her inability to follow through on her promises have led to not one but two removals of the child. Indeed, the child was in Mother's legal and physical custody for only approximately six months of the last five years. The continuation of the parent-child relationship also keeps the child from achieving permanence. Although the child is not in a pre-adoptive home, it does appear that one is available and that it will result in relatively little disruption for the child. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). Considering all of the circumstances, we cannot conclude that the trial court erred in finding clear and convincing

evidence of this ground for termination.

## B. Best Interests

Because at least one ground for terminating parental rights is supported by clear and convincing evidence, we now consider whether the trial court erred in finding that termination of Mother's parental rights was in the best interest of the child. After a ground of termination is established, "the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." *In re Audrey S.*, 182 S.W.3d at 877. The best interests of the child may not always lead to termination, even if a parent is deemed unfit by a court. *Id.*

To determine whether termination of parental rights is in a child's best interests the court shall consider, but is not limited to, the following factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). Further, our Supreme Court has explained that:

> Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681–82 (Tenn. 2017) (internal citations omitted). Determining the best interests of a child does not simply involve examining statutory factors or counting how many factors support or oppose a potential termination. *Id.* at 682. Each analysis must remain "factually intensive[,]" and consideration of the factors should be rooted in each case's unique facts and circumstances. *Id.*

The trial court first found that Mother had not made an adjustment of circumstances that would make it safe for her child to return to her custody, even after reasonable efforts were made by DCS. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (2). In particular, the trial court found that while Mother "was on the path" to making a permanent adjustment, her effort was too little, too late. As the trial court explained, Mother's progress did not begin until after the filing of the termination petition and even with the effort she has made too "many variables . . . are left open." The evidence does not preponderate against the trial court's findings. Although Mother has made progress, it all came after the filing of the termination petition. Moreover, Mother's plans for reunification rest on a variety of future circumstances that lack any semblance of certainty, as discussed in detail with regard to the persistence of conditions ground for termination, *supra*. The trial court did not err in finding that these factors heavily favor termination.

The trial court also found that Mother failed to maintain regular visitation with the child. *See* Tenn. Code Ann. § 36-1-113(i)(3). Specifically, the trial court found that while Mother was currently maintaining visitation, her historical visitation was sporadic, and she sometimes chose not to visit the child during periods of her life because she was not in a place to do so. The evidence does not preponderate against this finding. Although Mother has maintained visitation once her current rehabilitation program began, this progress occurred after the filing of the termination petition. Prior to that time, Mother's visitation was aperiodic, with Mother missing many visits, sometimes simply because she forgot or because she refused. This factor therefore supports termination.

We next consider the trial court's finding as to the relationship between Mother and the child. *See* Tenn. Code Ann. § 36-1-113(i)(4). In particular, the trial court found that Mother and the child are bonded and that "[t]here is no doubt that [Mother] has a meaningful relationship with the child." The trial court went further, however, to consider that this relationship was no more meaningful that the relationship that the child enjoyed with his foster family:

> The child probably has at least an equal relationship with his foster mother as he does with [Mother] because he has been in the custody of his foster mother longer than he has been in the custody and care of [Mother]. The Court finds that the aforementioned is problematic for the child. It would cause harm to the child to change the relationship that the child has with his foster mother and those circumstances that he is presently in.

Still, the trial court ultimately ruled that Mother had a meaningful relationship with the child. We agree. In addition to her current visitation, the record shows that Mother maintains contact with the child through letters and phone calls. Mother and the child have therefore been able to maintain a close relationship despite Mother's absence as his caretaker. Thus, this factor does not favor termination.

The trial court further found that a change in caretakers and physical environment would be detrimental to the child. *See* Tenn. Code Ann. § 36-1-113(i)(5). As the trial court explained:

> Out of the previous five (5) years, [Mother] has had custody of the child for approximately six (6) months. The child has been in the same foster care placement for the entire time that he has been in foster care. The child has been in the custody and care of the foster mother longer than he has been in the custody and care of [Mother]. Harm would be caused to the child and it would be problematic to change the child's relationship with his foster mother and the circumstances that he is presently in. As the Guardian ad Litem pointed out, the proof before the Court is that it would be very detrimental to the child if the Court were to change said relationship and circumstances. There was testimony about the current foster home not being a pre-adoptive home. However, there was also testimony about the prospective pre-adoptive home. The proof before the Court is that the prospective pre-adoptive home is the current foster mother's family. Thus, the child is going to be with the same family and in the same environment in the prospective pre-adoptive home. As it relates to [Mother], she is homeless, serving a sentence in treatment, and has no income. When the child was previously returned to the care and custody of [Mother], it only lasted about six about (6) months and the child had to be removed again due to severe child abuse. . . . Furthermore, the child has exhibited behavioral problems

- 23 -

but is doing well in school. Said behaviors appear to now be managed. Therefore, based upon the above, the Court finds that a change of caretaker and physical environment is likely to have a negative effect on the child's emotional, psychological, and/or medical condition.

The evidence does not preponderate against the trial court's findings as to this factor. Here, the child is in a stable home and has had considerable interaction with the prospective adoptive family. A permanent placement with this family would therefore cause less disruption to the child than placing the child with a mother that he sees only sporadically and who cannot currently care for him. Moreover, the evidence shows that the child initially reacted poorly after visiting with his Mother. This factor therefore favors termination.

The trial court also found that the child was a victim of severe abuse and that this factor weighed in favor of termination. Tenn. Code Ann. § 36-1-113(i)(6). Moreover, at one visitation, Mother claimed that she would "bust [the child's] ass" if the caseworker had not been present. An assessment following this comment indicated that Mother was at an elevated risk for physically abusing the child. This factor therefore favors termination.

The trial court next took issue with Mother's home environment, finding that Mother was essentially "homeless" and had been involved in criminal activity such that she was rendered unable to care for the child. Tenn. Code Ann. § 36-1-113(i)(7). Moreover, while the trial court conceded that Mother was sober, there was concern about Mother's drug use prior to her return to the controlled environment of the rehabilitation center. We agree. Mother was not presently in a stable home, but rather residing in a rehabilitation center. Prior to her entry into this program, Mother was evicted from her home. Mother had no concrete plans regarding future housing if her plan to return to the Nashville Rescue Mission did not come to fruition. And Mother's plan to return to the Nashville Rescue Mission could be described as uncertain at best. This factor therefore weighs in favor of termination.

The trial court, however, found that Mother was adequately addressing her mental health. Tenn. Code Ann. § 36-1-113(i)(8). The proof showed that Mother was participating in therapy to address her childhood trauma and that Mother was currently sober. The court noted, however, that Mother "still has a lot of work to do before the Court could even look at placing the child with her." We agree that the proof showed that Mother was adequately addressing her mental health issues through therapy. As such, this factor does not favor termination.

Finally, the trial court noted that Mother failed to consistently pay child support, which favored termination. *See* Tenn. Code Ann. § 36-1-113(i)(9). The record shows that while Mother paid some support, it was inconsistent even when she was employed.

Thus, the majority of the factors favor termination. As we have previously explained, however,

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d at 194). Along with Mother's mental health progress, one important factor does not favor termination: the meaningful relationship between Mother and the child. Mother argues that this case is therefore highly analogous with another case in which this Court concluded that termination was not in the child's best interest, *In re Liam S.*, No. E2016-02461-COA-R3-PT, 2017 WL 4422342 (Tenn. Ct. App. Oct. 4, 2017). In *Liam*, the mother's parental rights were terminated based on willful failure to visit and support, failure to establish a suitable home, substantial noncompliance with permanency plans, and persistence of conditions. *Id.* at *1. The proof showed that at the time of trial, the mother had been residing in a residential unlicensed, faith-based drug treatment program. Although this was not the first program that the mother attended without success, this program had so far been successful. *Id.* at *2. The mother, however, could not hope for reunification until she graduated from the program and completed ninety days of aftercare. *Id.* The mother had, however, maintained a relationship with the child despite her drug use and treatment. *Id.* at *11.

Based on these facts, another panel of this Court concluded that clear and convincing evidence did not exist that termination was in the child's best interest. The entirety of the analysis on this issue was as follows:

> We, like the trial court, believe that is was an extremely close case. Questions remain as to whether Mother may effectively parent the Children in a safe and stable home following her completion of the Life Changer's program. The Children currently reside in a safe and stable foster home with parents who love them and indicated a desire to adopt them. However, we cannot discount the fact that Mother has made tremendous progress through her year-long attendance at Life Changers. We believe that this is simply one of the rare cases where the parent has made a lasting adjustment, while managing to maintain a relationship with her children. We note that Mother faithfully attended visitation before and after the relevant time period and that the Children still referred to her as "mom" at the time of the hearing.

***Id.*** at *11.

Although we agree with Mother that ***Liam*** has many similarities to this case, we cannot conclude that the child's best interests in this particular case favor denying DCS's termination petition. Importantly, the time period at issue in ***Liam*** is significantly less than that at issue here. While the time that the child had been removed from the mother's custody in ***Liam*** was a little more than 2.5 years, Mother has had nearly double that amount of time in this case to get her life together. Specifically, the evidence shows that the child was first removed from Mother's custody approximately five years before trial and that Mother had custody of him for only six months of that time period. Thus, this case involves a significant amount of time in which Mother was offered a variety of services and yet still chose to use illegal drugs knowing that she could lose her child as a result.[9]

Moreover, the facts in ***Liam*** show that the mother enrolled in her last drug rehabilitation program more than six months prior to the filing of the termination petition and more than one year prior to the termination trial. ***In re Liam S.***, 2017 WL 4422342, at *2. In contrast, Mother only chose to return to the Nashville Rescue Mission after the filing of the termination petition, and, possibly, in an effort to avoid jail time. This Court has previously held that efforts following the filing of the termination petition are often "too little, too late." *See, e.g.,* ***In re A.W.***, 114 S.W.3d 541, 546–47 (Tenn. Ct. App. 2003) (indicating that mother's efforts after the filing of the termination petition constituted improvement, but ultimately holding that such improvement was "[t]oo little, too late"). Moreover, Mother had only been enrolled in her treatment program for approximately five months. Thus, Mother's apparent sobriety has only been tested for less than half the time that was at issue in ***Liam***. *See also* ***In re Addalyne S.***, 556 S.W.3d 774, 794 (Tenn. Ct. App. 2018), *perm. app. denied* (Tenn. July 30, 2018) (affirming the trial court's denial of the termination petition when the father was recently passing drug screenings outside of the structured environment of a treatment facility). Mother has also not "faithfully attended visitation," as from August 2018 to March 2019, she participated in only approximately 30% of offered visitation. Finally, the mother in ***Liam*** was already employed. In contrast, Mother would need to obtain employment in order to regain custody of her child, and her employment history was spotty at best.

We agree that a meaningful relationship with a child is an important factor that often weighs heavily against termination. *See* ***In re Addalyne S.***, 556 S.W.3d at 795 ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor; it is not error for a trial court to place similar weight on the fact that such a relationship exists."). However, we must determine the best interests of each child before this Court on "a case-by-case basis." ***In re Christopher L.B.***, No. M2012-00911-COA-R3-PT, 2012 WL 4473757, at *2 (Tenn. Ct. App. Sept. 27, 2012).

---

[9] DCS provided Mother with the Criteria & Procedures for Termination of Parental Rights as early as July 2017 and again on other occasions.

We certainly commend Mother on her efforts to both work on her sobriety and maintain a relationship with the child. While Mother's relationship with this child is meaningful, Mother has been unable to parent the child in most of the last five years of the child's life. And Mother's current progress is tempered by her failure to make lasting changes in the past. We are therefore unconvinced that Mother can maintain this progress following a jail stint and a move to a less controlled environment. And even if Mother can maintain her sobriety, her hoped-for reunification with the child is still months off. The child, however, deserves permanence now. And the proof shows that the child has an excellent chance of achieving a permanent home with as little disruption as possible. *Cf.* ***In re Aiden R.***, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *11 (Tenn. Ct. App. June 23, 2016) (finding that termination of the mother's parental rights was not in the child's best interest because no prospective adoptive home had been identified and the child's father's parental rights were not terminated). As such, we conclude that the trial court did not err in finding that the child's best interests are served through the termination of Mother's parental rights.

## CONCLUSION

The judgment of the White County Juvenile Court is reversed in part, affirmed in part, and remanded for further proceedings as are necessary and consistent with this Opinion. The termination of Respondent/Appellant Elaina L.W.'s parental rights is affirmed. Costs of this appeal are taxed to Respondent/Appellant Elaina L.W., for which execution may issue if necessary.


s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE